```
1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2
                       CASE NO. 22-CR-80175-RLR
3
     UNITED STATES OF AMERICA,
4                                     West Palm Beach, Florida
                  Plaintiff(s),
5                                     November 15, 2022
          vs.
6
     WILLIE BOONE,
7
                  Defendant(s).      Pages 1 - 32
8    -----------------------------------------------------------

9                         DETENTION HEARING
              TRANSCRIBED FROM DIGITAL AUDIO RECORDING
10          BEFORE THE HONORABLE BRUCE E. REINHART
                 UNITED STATES MAGISTRATE JUDGE
11
     APPEARANCES:
12
     FOR THE PLAINTIFF(S):  SHANNON O'SHEA DARSCH, ESQ.
13                          UNITED STATES ATTORNEY'S OFFICE
                            500 S. Australian Avenue
14                          West Palm Beach, FL 33401
                            (561) 209-1027
15                          shannon.darsch@usdoj.gov

16
     FOR THE DEFENDANT(S):  GREGG S. LERMAN, ESQ.
17                          330 Clematis Street
                            West Palm Beach, FL 33401
18                          (561) 832-5770
                            flercrdfns@aol.com
19

20   TRANSCRIBED BY:        Joanne Mancari, RPR, CRR, CSR
                            Court Reporter
21                          jemancari@gmail.com

22

23

24

25
```

1    Thereupon,

2    the following proceedings were held:

3            THE COURT:  The next matter is United States of

4    America v. Willie Boone.

5            Mr. Boone, why don't you go have a seat over there

6    with Mr. Lerman.

7            Good morning, Mr. Lerman.

8            MR. LERMAN:  Good morning.

9            THE COURT:  Can I have the government's appearance,

10   please.

11           MS. O'SHEA DARSH:  Good morning, your Honor.  Shannon

12   O'Shea Darsch on behalf of the United States.

13           THE COURT:  Good morning.

14           MR. LERMAN:  Gregg Lerman on behalf of Mr. Boone.

15           THE COURT:  Good morning.

16           Mr. Lerman, I know we appointed you last week.  Thank

17   you for taking the appointment.  It was on short notice and you

18   needed some time to talk to your client.

19           So the matter is on today for two things.  It is on

20   for arraignment and for a pretrial detention hearing.

21           Can we do the arraignment first, Mr. Lerman?

22           MR. LERMAN:  Yes.

23           Should I remain at counsel table?

24           THE COURT:  Yes.

25           MR. LERMAN:  On behalf of Mr. Boone, at this point we

1    will waive formal reading of the indictment, enter a plea of

2    not guilty, ask for a jury trial and entry of the standing

3    discovery order.

4              THE COURT:  Thank you very much.

5              I will at this time accept your waiver of the formal

6    reading, enter the plea of not guilty.  We will note the jury

7    trial demand in the record.  We will enter the standing

8    discovery order.

9              All right.  Is the defense ready to proceed with the

10   detention hearing?

11             MR. LERMAN:  Yes, sir.

12             THE COURT:  Is the government?

13             MS. O'SHEA DARSH:  Yes, your Honor.

14             THE COURT:  Hold on just one second.

15             (Pause)

16             THE COURT:  I have just been handed the Pretrial

17   Services report.  So if you will just give me a moment to

18   review that.

19             (Pause)

20             THE COURT:  Mr. Lerman, I am just going to note that

21   Mr. Boone does have some juvenile activity in the Palm Beach

22   County court system since 2018.  Can you just inquire whether

23   he ever appeared before Judge Bell and whether she adjudicated

24   any of his cases.

25             (Pause)

1          MR. LERMAN:  He is saying he doesn't recall the name,

2     but he indicates it was a male judge.

3          THE COURT:  OK.  Very well.

4          Mr. Boone, the reason I ask that is my wife is a

5     juvenile court judge over in Palm Beach County and if you had

6     any matters in front of her, I think Mr. Lerman would want to

7     know that, the government might want to know that.  OK.  It

8     appears you have never been in front of her then.

9          All right.  Thank you.

10         I have had a chance to review the Pretrial Services

11    report.  I will take judicial notice of the facts contained in

12    the Pretrial Services report.  I will also take judicial notice

13    of the returning of the indictment which establishes probable

14    cause that Mr. Boone has committed the offense of being a felon

15    in possession of a firearm as it relates to Count One.

16         With that, Ms. O'Shea Darsch, I will be happy to hear

17    any other evidence the government would like to offer by

18    proffer or by testimony.

19         MS. O'SHEA DARSH:  Thank you, your Honor.  The

20    government is seeking pretrial detention based on serious risk

21    of flight and danger to the community.  The government is

22    seeking detention pursuant to 3142(f)(2)(A), risk of flight,

23    and 3142(g), danger to the community.

24         The defendant here is charged with felon in possession

25    of a firearm, where the maximum penalty is ten years'

1    imprisonment.

2         The weight of the evidence against the defendant is

3    overwhelming.

4         The investigation of Boone began in February 2022 when

5    a confidential informant reported to the West Palm Beach Police

6    Department that a violent crime would be committed at 621 52nd

7    Street, building 2, in West Palm Beach, Florida, and that a

8    machine gun was at the residence.  This residence is known by

9    law enforcement due to previous surveillance and encounters

10   with individuals at the residence.  Law enforcement believes

11   the residence is a drug stash house only and that individuals

12   do not live at this residence.

13        Based on the information, law enforcement had the

14   confidential informant conduct two controlled narcotics buys at

15   the residence, which led to the application for a State search

16   warrant.  Both controlled buys were audio recorded.

17        On March 3, 2022, the West Palm Beach Police

18   Department obtained a State search warrant for the residence.

19   Prior to executing the search warrant, law enforcement

20   surveilled the area and observed Gibson in the front yard of

21   the residence appearing to conduct narcotics transactions.

22   Officers also observed another individual identified as

23   Mr. Boone standing in the front yard of the property.

24        Law enforcement ordered Mr. Boone to lay on the ground

25   and detained him.

1        During the search of the residence officers located

2    three firearms.  Law enforcement recovered a Glock 17 .9

3    millimeter semiautomatic handgun with a total of 25 rounds of

4    ammunition from a small living room table -- one live round was

5    in the chamber -- and a Glock switch was affixed to the back of

6    the slide.

7        West Palm Beach Police Department Crime Scene Unit

8    technicians test fired the weapon and confirmed that the switch

9    enabled the gun to fire continuously with a single trigger

10   pull.

11       Law enforcement also recovered a Springfield .9

12   millimeter semiautomatic handgun, with a total of eight rounds'

13   ammunition on the scene, living room table.  One live round was

14   in the chamber.

15       Both firearms were in plain view on the living room

16   table and both firearms were close in proximity.

17       Further, law enforcement observed a semiautomatic

18   shotgun from the back porch roof.  The serial number of the

19   firearm was scratched off and the buttstock and barrel were

20   also cut to shorten the firearm's overall length.

21       Additionally, law enforcement recovered narcotics at

22   the residence, on the living room table, where two of the

23   firearms were also located.

24       Officers found approximately 3.5 grams of suspected

25   marijuana and 1 gram of suspected fentanyl on a recliner chair.

1    In that same room, right next to the table, officers recovered

2    .6 grams of suspected crack cocaine, and in a cabinet officers

3    found approximately 5.1 grams of MDMA.

4             The narcotics field tested positive for fentanyl,

5    marijuana, cocaine, and MDMA.

6             Boone consented to providing a DNA sample and officers

7    obtained a State search warrant for a DNA sample from Gibson.

8             The Palm Beach County Sheriff's Office lab compared

9    the three individuals' DNA to DNA samples taken from DNA

10   collected from the firearms, and the Palm Beach County

11   Sheriff's Office lab determined there was very strong support

12   that the Glock pistol contained the DNA of both Gibson and

13   Boone.  Specifically, the PBSO lab determined that it is

14   approximately 40 quattuordecillion times more likely that the

15   sample originated from Gibson and Boone and an unknown

16   individual than if the DNA profile team originated from three

17   unknown individuals.

18            Regarding the Springfield pistol, the PBSO lab

19   determined that there was very strong support that the pistol

20   contained the DNA of Boone, stating that it is approximately 10

21   octillion times more likely that the sample originated from

22   Boone and an unknown individual than if the DNA profile team

23   originated from two unknown individuals.

24            ATF special agent Vincent Rubbo confirmed that the

25   Glock and Springfield Armory pistols were both manufactured

1   outside the State of Florida and therefore traveled in and

2   affected interstate and/or foreign commerce.

3           Certified convictions confirm that Mr. Boone is a

4   convicted felon.  Mr. Boone has recent 2021 drug convictions

5   for the sale of cocaine.  He also has a 2019 conviction for

6   grand theft and a 2018 conviction for being a delinquent in

7   possession of a firearm.

8           That concludes my proffer, your Honor.

9           Do you want me to proceed to my argument?

10          THE COURT:  If I could just make sure I got my notes

11  correctly here.  You said Mr. Boone was in the front yard

12  observed by the police.  Was he observed conducting

13  transactions or he was just in the front yard?

14          MS. O'SHEA DARSH:  He was only observed on the

15  property outside the residence, but on the property it was the

16  codefendant Mr. Gibson that law enforcement observed conducting

17  transactions, what appeared to be a narcotics transaction.

18          THE COURT:  That was Mr. Gibson.  OK.

19          Then you mentioned that the confidential informant did

20  two controlled buys at the residence.  Was Mr. Boone part of

21  either of those transactions?

22          MS. O'SHEA DARSH:  Only Mr. Gibson.  The other

23  individual has not been identified by law enforcement.

24          THE COURT:  OK.  Then in terms of the narcotics -- I

25  understand there were two guns on the table in the living room

1  in plain view, the Glock and the Springfield.  There was a

2  shotgun --

3           MS. O'SHEA DARSH:  Yes.

4           THE COURT:  -- I think it was on the back porch.  You

5  said it the buttstock and the barrel had been cut down.  Was it

6  a short-barrel shotgun?

7           MS. O'SHEA DARSH:  It had been cut down to shorten.

8           THE COURT:  But it had been cut down so short that

9  it -- your agent is nodding his head.  You may want to consult

10 with him.  I'm just trying to determine if it met the statutory

11 definition of a short-barrel shotgun, which I think is 12

12 inches, 14 inches.

13          AGENT FUCHSMAN:  16.

14          THE COURT:  16 inches.

15          MS. O'SHEA DARSH:  Yes, your Honor.

16          THE COURT:  It did.

17          MS. O'SHEA DARSH:  But to --

18          THE COURT:  But there is nothing connecting Mr. Boone

19 directly to that firearm.

20          MS. O'SHEA DARSH:  Correct.

21          THE COURT:  I just want to be clear.

22          Then finally, the narcotics that you rattled off, I

23 think was 3.5 grams of marijuana, 1 gram of fentanyl, .6 grams

24 of crack cocaine, and 5.1 grams of MDMA?

25          MS. O'SHEA DARSH:  Yes.

```
 1              THE COURT:  OK.  I just want to make sure -- I wrote
 2     as fast as you were talking, which is fine.
 3              MS. O'SHEA DARSH:  I will slow down.
 4              THE COURT:  No, no.
 5              MS. O'SHEA DARSH:  I'm a fast -- I read quickly.
 6              THE COURT:  I am too.  Not your fault.
 7              All right.  Thank you.
 8              Mr. Lerman, would you like to cross-examine?
 9              I will hear argument after the evidence is closed.
10              Mr. Lerman, would you like to cross-examine the agent?
11              MR. LERMAN:  Yes.
12              THE COURT:  Special agent, if you would come forward,
13     please.
14              MR. LERMAN:  Although it will be shorter than it was
15     going to be because you asked some of what I was going to ask.
16              THE COURT:  No problem.  Take as much time as you
17     need.
18              Before you sit down, if you would raise your right
19     hand.
20              Do you swear or affirm that your testimony will be the
21     truth, the whole truth, and nothing but the truth?
22              THE WITNESS:  I do.
23              THE COURT:  Have a seat, please.
24              Before you start your testimony, if you would just
25     tell us your name, spell your last name for the record, and
```

Fuchsman - Cross

1   tell me where you work, please.

2           THE WITNESS:  Daniel Fuchsman, F-U-C-H-S-M-A-N.  I'm a

3   task force officer for the ATF for the West Palm Beach Police

4   Department.

5           THE COURT:  OK.  This is always offered where you're

6   sitting, so I always give the same instruction.  Look at

7   Mr. Lerman and answer his questions.  You don't need to look at

8   me.  I know you're trying to be respectful and polite, but it

9   is easier if you just look at him.  I can hear you clearly.

10          THE WITNESS:  Yes, sir.

11          THE COURT:  Mr. Lerman, go right ahead with agent

12  Fuchsman.

13   DANIEL FUCHSMAN,

14       called as a witness,

15       having been duly sworn, testified as follows:

16  CROSS-EXAMINATION

17  BY MR. LERMAN:

18  Q   Good morning, agent.

19  A   Good morning.

20  Q   The property that we're talking about here had two

21  structures?

22  A   Correct.

23  Q   It had a front house and then like a guesthouse or a back

24  house, is that what I understand?

25  A   That is correct.

Fuchsman - Cross

1   Q  The warrant was for the back house?

2   A  Yes, sir.

3   Q  Where you saw Mr. -- I don't know if you saw him, but where

4  Mr. Boone was observed that day that the warrant was executed,

5  he was on the front lawn of the front home?

6   A  To my knowledge, yes.  I was not there to personally see

7  where he was apprehended.

8   Q  And to your knowledge, when officers or agents approached

9  Mr. Boone and directed him to the ground, he cooperated with

10  them?

11   A  Yes, sir.

12   Q  He didn't run or attempt to take flight?

13   A  No, sir.

14   Q  And he consented to giving his DNA at that time?

15   A  From my knowledge, yes.

16   Q  To be clear, from your knowledge, the transactions that

17  were conducted undercover through the confidential informant at

18  the back house did not involve Mr. Boone.  That's a correct

19  statement?

20   A  From my knowledge, yes.

21   Q  Other than the firearms that it's been indicated had

22  Mr. Boone's DNA on it, were there any other items that you're

23  aware of that would have connected Mr. Boone to the back house?

24   A  There were two cell phones recovered.  We have yet to get

25  into them, but we believe they do belong to Mr. Boone.

Fuchsman - Cross

1           THE COURT:  I'm sorry.  Could you speak just a little

2      louder.  I couldn't hear your answer.

3           THE WITNESS:  There were two cell phones that were

4      recovered next to the narcotics and firearms.  We have yet to

5      get inside of them.

6      BY MR. LERMAN:

7      Q   You're saying they are believed to be Mr. Boone's?

8      A   Correct.

9      Q   But you don't know whether they are or are not Mr. Boone's?

10     A   That is correct.

11     Q   So was DNA done on those cell phones?

12     A   No, sir.

13     Q   Were fingerprints done on those cell phones?

14     A   I believe so.

15     Q   And do you know whether those fingerprints were compared to

16     Mr. Boone's or not?

17     A   I don't believe any good fingerprints were actually taken

18     from the cell phone.

19     Q   Nothing usable at least?

20     A   Correct.

21     Q   Any other property, whether it be mail or coffee cups or

22     anything else that would have connected Mr. Boone to the

23     interior of the home?

24     A   The interior is not livable.  I would say no.  It is mostly

25     just an area set up to store items for narcotic sales.

Fuchsman - Cross

1   Q   Do you know whether or not the firearms had the DNA of more

2   than one individual identified?

3   A   I'd have to look at the report.  I know there's one that

4   says Kevin Gibson and Boone and then one with just Willie

5   Boone.

6   Q   But you haven't seen -- do you have the report with you?

7   A   I do not.

8   Q   I'm talking about the DNA report.

9   A   Correct.

10  Q   Did you review Mr. Boone's criminal history?

11  A   I did look at it, yes, sir.

12  Q   Do you know when he was released from the Department of

13  Corrections?

14  A   Not that I can recall.

15  Q   Do you know when he entered the Department of Corrections

16  in 2021?

17  A   Not the exact date, no, sir.

18  Q   You may or may not know the answer to this question.

19      As to the firearms that were found, obviously they

20  were manufactured out of state.  Are you aware of when they may

21  have been manufactured?

22  A   I am not aware.

23      MR. LERMAN:  I don't have any other questions.

24      THE COURT:  Thank you.

25      Any redirect from the government?

1              MS. O'SHEA DARSH:  Nothing, nothing further, your

2    Honor.

3              THE COURT:  Agent Fuchsman, you may step down.  Thank

4    you.

5              THE WITNESS:  Thank you.

6              (Witness excused)

7              THE COURT:  Any other evidence from the government?

8              MS. O'SHEA DARSH:  No, your Honor.

9              THE COURT:  Any evidence from the defense?

10             MR. LERMAN:  No.

11             THE COURT:  Thank you.

12             Ms. O'Shea Darsch, let me hear argument from the

13   government.

14             I was also asking the same question.  Mr. Lerman,

15   maybe you know or can look it up.  It looks like Mr. Boone was

16   serving a sentence of 366 days in the Department of

17   Corrections.  Let's see if we can reach agreement maybe among

18   the three of us on a fact.

19             If I'm looking correctly at the Pretrial Services

20   report, it appears that on May 5th of 2021 Mr. Boone was

21   sentenced to 366 days in the Department of Corrections with 84

22   days' credit for time served.

23             Does that lead me to believe that he had been in

24   custody for 84 days before May the 5th?

25             MR. LERMAN:  Correct.

```
 1              THE COURT:  Mr. Lerman, you're the expert on state

 2     practice.

 3              MR. LERMAN:  Yes.

 4              THE COURT:  OK.  So if I go back 84 days from May the

 5     5th, that would put me before March the 7th.  It looks like he

 6     was arrested on a VOP on March 7th.  So I'm just confused.

 7              Do you know the sequencing there, Mr. Lerman?

 8              MR. LERMAN:  If the ultimate question is when was he

 9     released from the Department of Corrections, it was December

10     17th.

11              THE COURT:  No.  December 17th of 2021.

12              MR. LERMAN:  Of 2021.

13              THE COURT:  No.  That was one of my questions.  My

14     other question was, I'm just trying to understand the

15     sequencing here because he has an arrest for a VOP on March

16     7th, but it looks like he may have been in custody on that day.

17     I'm just trying to reconcile in my own mind whether that is an

18     inconsistency, whether I'm reading it wrong, or what happened

19     there.

20              MR. LERMAN:  He doesn't recall being on probation,

21     Judge.

22              THE COURT:  No, no.  I'm sorry.  Not VOP.  FTA.  It

23     says an arrest for failure to appear on March the 7th on the

24     charge for which he was later sentenced on May the 5th.  So

25     that is what I'm just trying to understand because that doesn't
```

1    jive with having 84 days of time-served credit.

2         MR. LERMAN:  Where are you looking?

3         THE COURT:  I am on page 7 of the Pretrial Services

4    report.  If you look at his criminal history, it indicates that

5    on March the 9th -- it looks like on March the 9th of 2020 he

6    got arrested and was charged with sale of cocaine in a case

7    number ending in 3901, sale of cocaine in a case ending in

8    4503, and then possession with intent in a case ending in 4001.

9    So it looks like he was arrested on May the 9, 2020 on three

10   charges, on three cases.

11        It says he is arrested on a VOP on May -- on March the

12   7th of 2021.  So ten months later he is arrested for failing to

13   appear.  I'm sorry.  I keep saying VOP.  Failure to appear.

14        Then it looks like less than 60 days later he is

15   sentenced to a year and a day with 84 days' time served.  So

16   I'm just trying to reconcile when was he in and when was he

17   out.

18        MR. LERMAN:  One second.

19        THE COURT:  Yes.  And did he in fact fail to appear on

20   March the 7th.

21        (Pause)

22        THE COURT: Mr. Lerman, the probation officer is

23   speculating perhaps Mr. Boone got credit for some time when he

24   was originally arrested before he may have bonded out.  But if

25   you know, that would be helpful.  If you don't know, I --

1            MR. LERMAN:  Mr. Boone is indicating that it is his

2       recollection, at least, that on March 7th he was arrested, in

3       custody.  In reality, there was a misdemeanor that he failed to

4       appear for previously.  I think it is going to take some time

5       to unwrap --

6            THE COURT:  Unwrap what that is.

7            MR. LERMAN:  -- all of that.

8            I can tell the court that as of May of 2021 when he

9       entered the plea he remained in the DCC, once he was

10      transported to the DCC, until December 17th of 2021.

11           THE COURT:  Right.  I was more concerned about the

12      period of time immediately before that.  OK.  You have answered

13      my question.  Thank you.

14           Mr. O'Shea Darsch, I didn't mean to cut you out of the

15      conversation.  If you know anything different or want to be

16      heard on that.

17           MS. O'SHEA DARSH:  No.  Unfortunately, I don't have

18      his Pen-Packet on me, which would give me that information.

19           THE COURT:  That's fine.

20           Let me hear the government's argument for detention.

21           MS. O'SHEA DARSH:  Based on the facts, there is

22      overwhelming evidence against the defendant.  His DNA is on the

23      fully automatic firearm, which, in essence, is a machine gun

24      with a Glock switch affixed to it, and the Springfield Armory

25      pistol.  The firearms were laying openly on the living room

1    table in close proximity to drugs, and law enforcement saw

2    Boone at the residence on the day they were executing the

3    search warrant.

4            As to risk of flight, the defendant has numerous prior

5    arrests for violations of probation and, as the Pretrial

6    Services report indicates, the defendant has approximately

7    three recent failures to appear.

8            He is also facing a significant amount of time.  Based

9    on the government's calculations, he is facing 63 to 78 months'

10   imprisonment, and he also has prior 2019 convictions for giving

11   a false name upon being arrested and a conviction for

12   unauthorized possession of a driver's license or ID card.

13           As to danger to the community, the firearm is fully

14   automatic, it is a fully automatic firearm.  It is a machine

15   gun.  The confidential informant reported there would be a

16   violent crime at the residence, and the residence is well known

17   by law enforcement as a drug house.  He also has prior

18   convictions for drugs and a recent conviction for being a

19   delinquent in possession of a firearm.  So this is not his

20   first firearm offense.

21           Additionally, he has two open state cases for

22   resisting an officer with violence and giving a false name upon

23   being arrested and domestic battery.

24           So based on this, your Honor, there are no conditions

25   or combination of conditions that will reasonably assure the

1   appearance of the defendant as required and the safety of the

2   community.

3           THE COURT:  Thank you.

4           Mr. Lerman.

5           MR. LERMAN:  First I want to just clarify one issue.

6   I believe it indicated there was a recent failure to appear on

7   November 8th.  That is actually when he was arrested on this

8   case as he was going to court.  So that failure to appear is

9   due --

10          THE COURT:  The warrant issued on the domestic?

11          MR. LERMAN:  Right.  This arrest.

12          THE COURT:  Got you.

13          MR. LERMAN:  He has lived here his entire life.  He

14  has family here as well as in Volusia county.  So he certainly

15  has family ties and a connection to the community.

16          I really base primarily our argument on what happened

17  that day.  He was in the front yard of these two homes.  There

18  has been no indication that he was involved in any of the drug

19  transactions that may or may not have been taking place at that

20  home when police arrived to execute the warrant, and he was in

21  front of the front house.  He complied with the direction of

22  law enforcement.  He didn't resist either with or without

23  violence by taking flight.

24          According to the complaint, the only one of the three

25  apparently that were stopped that consented to giving DNA.  The

 1   other two individuals I'm assuming said no since a warrant was

 2   sought.  And it's been March.  So seven, eight months since

 3   this warrant was executed and they came in contact with him and

 4   he's remained in the area.  I am not saying by any stretch of

 5   the imagination he's been a saint, but he certainly is not a

 6   flight risk in this particular case, and we are asking the

 7   court to set a bond.

 8           THE COURT:  All right.  Thank you very much.

 9           Anything further from the government?

10           MS. O'SHEA DARSH:  Just one more thing I wanted to

11   point out to the court.  The Pretrial Services report indicates

12   his address at 4710 Spruce Avenue, West Palm Beach.  That is

13   only six blocks away from the residence in question.

14           THE COURT:  OK.  Mr. Lerman, it indicates in the

15   Pretrial Services report -- let me ask it this way.

16           If I were to agree with you and grant a bond, where is

17   Mr. Boone going to live and who is he going to live with?

18   Because it says here in the Pretrial Services report he says he

19   can live with his grandmother and his grandmother says no, he

20   can't.

21           MR. LERMAN:  As I understand it, he would be living

22   with the woman who is identified as his girlfriend.

23           THE COURT:  OK.

24           MR. LERMAN:  Ms. Ettiene.  And I have spoken to

25   Ms. Ettiene by phone.  She lost her ID so she is not allowed in

1    the courthouse.

2              THE COURT:  I understand.  But the idea would be that

3    he would live with her at the address on Spruce Avenue.

4              MR. LERMAN:  That is what I understand, although there

5    was discussion, if you were to set bond, if he would get

6    permission to relocate to another county within the State of

7    Florida.

8              THE COURT:  Understood.  OK.

9              All right.  So what I have to consider is whether the

10   government has met its burden of showing that there are no

11   condition or combination of conditions that would reasonably

12   assure that Mr. Boone will appear as required and that will

13   reasonably assure the safety of the community.

14             As to risk of nonappearance, the standard is the

15   government has to prove by a preponderance of the evidence,

16   meaning it is more likely than not, that there are no

17   conditions or combination of conditions I could set.

18             As to danger to the community, the government has to

19   prove by clear and convincing evidence that there are no

20   conditions or combination of conditions I would set, meaning

21   that there is evidence sufficient to create an abiding

22   conviction that future danger is highly probable.

23             So let me first look at the risks here and then talk

24   about whether I believe there are conditions that would

25   mitigate those risks, and in doing so the statute requires me

1    to look at a number of factors.

2              First, the nature and circumstances of the offense,

3    the weight of the evidence, the history and characteristics of

4    Mr. Boone, and the nature and seriousness of any other danger

5    that would be presented here.

6              So let me start with the nature and circumstances of

7    the offense.

8              The alleged offense here is possession of a firearm by

9    a convicted felon, which is by its nature a dangerous offense.

10   Congress has concluded that people who have felony convictions,

11   and Mr. Boone has multiple felony convictions, shouldn't be

12   allowed to have guns because that creates an inherent danger to

13   the community.

14             So that is the nature of the offense.  It is a

15   violence-driven offense.  And also, although not specifically

16   the offense charged, but there is certainly evidence here that

17   Mr. Boone was involved at some level in trafficking narcotics.

18             It indicates in the Pretrial Services report that he

19   has not been gainfully employed for I think close to -- well,

20   he was in custody, but even since he's been out of custody he

21   hasn't been gainfully employed since March of 2022.  So that

22   suggests he was doing something else to support himself and

23   what he was doing was not legal.  So that is the nature of the

24   offense.

25             The circumstances sort of ties in with the weight of

1    the evidence here.  Essentially, the evidence here is that his

2    DNA is on the gun.  That is essentially the government's

3    evidence.  With all due respect to the people at ATF, their

4    statistics are completely wrong.  It is not a one in whatever

5    quadrillion probability.  It is much, much, much, much lower

6    than that.  Nevertheless, there is some evidence that his DNA

7    is on the gun and he is in the location at the time when all

8    these bad events are happening and he has a history of violence

9    in the past and a history of acquiring firearms in the past, so

10   there will be some inferences that the jury can draw from that.

11   So I think the weight of the evidence in this case is strong

12   but it is not overwhelming.

13        I look at the history and characteristics of the

14   defendant, and Mr. Boone has a troubled youth.  He had a lot of

15   issue with the criminal justice system.  He continues to have

16   those issues.  He is a young man, and sometimes that happens.

17   But what is concerning here is that there seems to be a

18   consistent pattern of when he is not in custody he is either

19   getting guns or dealing drugs.  Not uncommon, unfortunately,

20   for the people who have grown up in the situation he's grown up

21   in, but it is not a good one, and he is heading down a bad road

22   apparently.  So there is that.

23        The other thing, and I think the government is right

24   about this, he has some history of failing to appear and

25   failing to comply with conditions imposed by the court.  So

1   left to his own devices it is unclear to me whether he would be

2   responsible enough to come to court.  I'm not saying he would

3   necessarily run away, but that is not the standard.  The

4   standard is not appearing in court; it is not fleeing the

5   jurisdiction.  He has a history of not showing up in court when

6   he is required to show up in court.

7        Also, as Mr. Lerman points out, he does have ties to

8   this community.  He was born here.  He has ties to Volusia

9   county.  No ties apparently outside the State of Florida and,

10   candidly, not much of an ability to run away and live on the

11   lam if he wanted to.  So I am more concerned about

12   nonappearance than I am with flight given the history of

13   nonappearance here.

14        So those are the factors I have to consider.

15        Then what are the conditions I could consider.  Well,

16   one I could consider is imposing some sort of house arrest or

17   electronic monitoring to make sure that we know where Mr. Boone

18   is, and that presumably would mitigate the risk of him not

19   showing up because we'd know where he is and we could find him.

20   I could impose some sort of a requirement that he find a

21   responsible adult to cosign on the bond, who would not be his

22   girlfriend but, rather, some independent person who is going to

23   vouch for him and put themselves on the line and make sure he

24   shows up in court as required.  That would also mitigate that

25   risk.

1        So I think that combination of conditions could

2  mitigate the risk of nonappearance here.  I think that would

3  reasonably mitigate the risk of nonappearance here.

4        I do give him credit for the fact that when he was

5  approached by the police he was cooperative, he didn't try to

6  flee, he was at all times cooperative, which shows a level of

7  maturity and understanding of how the system works and a

8  respect for the system.

9        In this case I am much more concerned with the danger

10  to the community factor, to be honest.  We have a crime here

11  that involves firearms.  We have a firearm here that's been

12  converted to be a fully automatic weapon.  We have Mr. Boone's

13  DNA on the weapon.  We have a history of him in the past

14  having, despite being a delinquent and being told he's not

15  allowed to have firearms, he had a firearm anyway.

16        We have a history of recent violence involving at

17  least an alleged domestic battery, and another felony battery

18  in 2020, and we have a resisting with violence.  I generally

19  discount resisting without violence because I think that is

20  just mouthing off to the police officer, usually is what

21  resisting without violence is.  But we have a resisting with

22  violence in 2021.  I understand that charge has never been

23  resolved so I don't hold that against him other than that is an

24  accusation.

25        So I am concerned about the danger to the community

1    aspect here.

2            So the question is whether a condition of house arrest

3    and having a responsible cosigner on the bond would be

4    sufficient to mitigate, reasonably mitigate the risk to the

5    community.  The concern is, of course, the alleged crime here

6    is possession of a firearm, which you can do when you're locked

7    in your own house, and dealing drugs, which you can do when

8    you're locked in your own house.

9            So considering all those factors, I recognize, though,

10   that clear and convincing evidence is a very, very high

11   standard and I'm not prepared to say the government has met

12   that standard and that the conditions I'm considering wouldn't

13   be sufficient to reasonably assure the safety of the community.

14   So I will set a bond in this case, but it is going to be a

15   pretty strict bond.

16           I'm not sure, candidly, Mr. Boone, you're going to be

17   able to make the conditions of this bond.  I am not going to

18   set a financial condition you can't make.  I can't do that.

19   But I am going to set other conditions that I think are

20   reasonable and necessary.  Hopefully you can meet those

21   conditions.  But if you can't, then you're not going to get

22   out.

23           So I am going to release Mr. Boone on a $100,000

24   personal surety bond.  I am going to require that he find a

25   responsible adult cosigner who can sign on the bond, and also

1    that he establish some place that he can live other than with

2    Ms. Ettiene.  I understand he has a child and he is in a

3    relationship with her, but clearly living with her is not a

4    deterrent to him engaging in criminal activity, and I want him

5    to live with somebody who is a more responsible adult, who is

6    willing to take responsibility for him.  So I will require a

7    cosigner.

8         I would also impose house arrest and a curfew and

9    electronic monitoring, and I will set more specific conditions

10   if and when we find out where he is going to live and who he is

11   going to live with, but I am going to impose some form of

12   electronic monitoring and curfew and house arrest.

13        I would also impose the following standard conditions

14   of bond, which are that he is to comply with all federal, state

15   and local laws while on release.  He is to appear in court as

16   required at all times.  Failure to appear is a new crime

17   punishable by up to five years in jail.

18        He is not to travel outside the Southern District of

19   Florida.  Hold on.

20        Volusia County is in the Middle District, Mr. Lerman,

21   am I right?

22        MR. LERMAN:  I believe so.

23        THE COURT:  What is the major city in Volusia County?

24        THE DEFENDANT:  Daytona.

25        THE COURT:  Daytona.  So it is in the Middle District.

1    See, Judge McCabe would have known better than I.  He is from

2    Daytona.

3          All right.  I am going to limit his travel to the

4    Southern District of Florida.  If he wants to travel to the

5    Middle District or elsewhere, he can travel with prior

6    permission of Pretrial Services if he is released.

7          Again, I will order him to live wherever he is going

8    to live, once I know where he is going to live, and not change

9    his address without getting prior permission from Pretrial

10   Services.

11         He's already given DNA, so I think that is a moot

12   issue, and he is to comply with all federal, state, and local

13   laws.  If he has any contact at all -- if you have any contact

14   at all, Mr. Boone, with law enforcement, you must report it to

15   your probation officer within 72 hours.  I'm not saying

16   anything bad is going to happen, but if a cop comes up and

17   starts talking to you on the street, you've had contact, you

18   need to report it.  OK.

19         I am also going to impose the following special

20   conditions.  One is that Mr. Boone is to surrender any

21   passport, if he has one, and not to obtain any passport or

22   travel documents.  Second, he is to report to Pretrial Services

23   as directed by Pretrial Services.  That could either be by

24   phone, in person, by Zoom, whatever it may be.

25         I do want him assessed for mental health and drug

1   abuse.  So at this time I am not ordering he receive -- I am

2   going to be clear, Mr. Boone.  I am not saying you should

3   receive counseling or treatment for that, but I do think an

4   assessment is appropriate, and if Pretrial determines that it

5   would be helpful for you to get some mental health treatment or

6   some drug treatment, you are to successfully complete that

7   treatment as a condition of your bond.

8       Depending on the curfew situation, I will address

9   whether he is to maintain employment or education.

10      He is not to have any contact with victims or

11  witnesses, if there are any.  If there are any victims or

12  witnesses, the government can provide that information to the

13  Pretrial Services officer and to Mr. Lerman.

14      He is also not to have any contact with his

15  codefendant, Mr. Gibson, and to any other codefendants or

16  coconspirators that the government wants to identify to

17  Mr. Lerman.  I understand you may not want to tell him given

18  that it is an ongoing investigation, but Mr. Boone can only

19  stay away from the people he knows to stay away from.

20      He is not to go to -- even if he is as part of his

21  conditions, even if he is off curfew, he is not to go to the

22  location at 621 52nd Street.

23      Ms. O'Shea Darsch, did I write that down --

24      MS. O'SHEA DARSH:  Yes.

25      THE COURT:  He is not to go within a thousand feet of

```
 1    that location as a special condition.

 2              He is not to have any firearms.

 3              Mr. Boone, it is a crime for you to have a firearm.

 4    Now it is a violation of your bond as well.  That means you

 5    can't have one, anybody in your house can't have one, and you

 6    can't go anywhere where you know somebody has one, other than

 7    when you come to the courthouse, we have security guards, but

 8    you can't be anywhere where you can have access to any

 9    firearms.

10              I will address other special conditions if Mr. Boone

11    is able to produce a cosigner for the bond.

12              All right.  Not waiving any objection the government

13    may have to the bond that I have set, does the government need

14    any clarification or modification of the conditions?

15              MS. O'SHEA DARSH:  No, your Honor.

16              THE COURT:  Mr. Lerman, do you need any clarification

17    or modification of the conditions?

18              MR. LERMAN:  I think the only clarification would be

19    if his mother, who is in Volusia County, was willing to let him

20    live in Volusia County.

21              THE COURT:  If his mother is willing to sign on the

22    bond and I can speak to his mother, and I will do that by phone

23    if she doesn't want to drive all the way down from Daytona, and

24    I am satisfied that she will be a responsible adult and take

25    care of him, I would consider that and I would let him move to
```

```
 1    Volusia County to live with his mother or some other family
 2    member in Volusia County.
 3              MR. LERMAN:  OK.
 4              THE COURT:  So I'm not limiting you to finding a
 5    responsible adult in Palm Beach County, if that is your
 6    question.
 7              MR. LERMAN:  Yes.
 8              THE COURT:  And I'm not excluding a family member.
 9    OK.
10              Does the government -- well, does the government want
11    me to stay the release order or do you want to wait and see if
12    he actually gets somebody before we reach that?
13              MS. O'SHEA DARSH:  No, your Honor.
14              THE COURT:  Thank you, Mr. O'Shea Darsch.
15              Well argued on both sides.
16              Mr. Boone, I hope for your sake that you're able to
17    find somebody to cosign on this bond, and if you do, you will
18    be back in front of me and I will release you at that time.
19              THE DEFENDANT:  Thank you.  Appreciate it.
20              THE COURT:  Well argued, Mr. Lerman.
21              Have a good morning, everybody.
22              (Adjourned)
23
24
25
```

C E R T I F I C A T E


     I hereby certify that the foregoing is an accurate

transcription to the best of my ability of the digital audio

recording in the above-entitled matter.


January 19, 2023          s/ Joanne Mancari
                          Joanne Mancari, RPR, CRR, CSR
                          Court Reporter
                          jemancari@gmail.com